**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:

Case No. 6:26-bk-05428-GER
**Chapter 11**

**SHERWOOD CONSTRUCTION, INC.,**
Debtor.
_______________________________________/

**DEBTOR'S DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF LIQUIDATION**

THIS IS A SOLICITATION OF VOTES ON THE PLAN ONLY FROM HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE. THE COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT UNDER *11 U.S.C. § 1125* AS CONTAINING ADEQUATE INFORMATION. THIS DRAFT IS SUBJECT TO REVISION. COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF THE PLAN OR A GUARANTEE OF ANY RECOVERY.

## ARTICLE I — INTRODUCTION AND OVERVIEW

1.1 Sherwood Construction, Inc., as debtor and debtor-in-possession (the "Debtor"), submits this Disclosure Statement under *11 U.S.C. § 1125* in connection with its Chapter 11 Plan of Liquidation (the "Plan"), a copy of which accompanies this Disclosure Statement. Capitalized terms not defined here have the meanings given in the Plan.

1.2 This case began as an involuntary Chapter 7 case filed on July 20, 2026 and was converted to Chapter 11 on the Debtor's motion by order entered September 8, 2026 [Doc. 8]. Canaveral Crossroads, LLC is the subject of a separate involuntary case pending in this district, Case No. 6:26-bk-05426-GER. The two cases are not jointly administered.

1.3 The Plan is the Debtor's own plan, not a joint plan. It classifies and treats only Claims against the Debtor. The two cases are administered separately; the estates are not merged and are not substantively consolidated. Canaveral matters to this Plan in one respect only — Canaveral owes money to the Debtor, and the amounts the Debtor collects from Canaveral are one of several sources of the Cash that will be distributed to the Debtor's creditors. Canaveral will propose its own plan in its own case, and the creditors of Canaveral will vote on that plan, not on this one. If you hold a Claim against Canaveral and not against the Debtor, you are not entitled to vote on this Plan and will receive nothing under it.

1.4 The Plan is a liquidating plan. A Plan Administrator (proposed: Ross Johnston) will prosecute lawsuits to collect the money owed to the Debtor, prosecute the estate's Causes of Action, and distribute the proceeds to the Debtor's creditors.

1.5 Two features of the Plan matter most. First, the Debtor has no secured creditors — no creditor holds a perfected, unavoidable security interest in any asset of the Debtor — so the Plan creates no class of secured claims, and every unsecured creditor, without subclassification, shares Pro Rata in one class,

Class 2. Second, Class 2 is paid from the "Creditor Share": fifty percent (50%) of every dollar the Plan Administrator collects, including amounts collected from Canaveral. The other fifty percent (50%) — the "Collection Cost Share" — pays the cost of the collection effort itself, including contingency fees and litigation costs, together with the administrative and priority claims of the estate.

1.6 Your rights depend on the Class in which your Claim falls. The Debtor urges each holder entitled to vote to read this Disclosure Statement and the Plan carefully, to complete the enclosed ballot, and to return it so that it is received by the voting deadline of ____________, 2026. The confirmation hearing is set for ____________, 2026.

## ARTICLE II — BACKGROUND

**The Debtor and its business.**

2.1 The Debtor is a Florida corporation that served as the construction company for an integrated resort enterprise on Merritt Island, Florida developed by its affiliate, Canaveral Crossroads, LLC. The Debtor is owned by Tiered Capital, Inc.; Martin C. Flynn, Jr. is a former officer; and Ross Johnston serves as Chief Restructuring Officer.

**Events leading to the bankruptcy case.**

2.2 The Debtor ceased active operations and became the subject of extensive litigation, including the guaranty-enforcement action brought by PEDIXON, LLC and related disputes over the underlying loan structure, together with construction and trade claims. The Debtor's liabilities exceed the realizable

value of its assets, and an orderly, court-supervised liquidation offers creditors the best available recovery.

**The involuntary filing and the conversion.**

2.3 On July 20, 2026, petitioning creditors filed an involuntary Chapter 7 petition against the Debtor. The clerk issued the summons, and the Debtor — which does not contest the petition — consented to the order for relief and moved to convert the case to Chapter 11 to pursue this liquidating Plan. The court entered its Order (1) for Relief and (2) Converting Case from Chapter 7 to Chapter 11 on September 8, 2026 [Doc. 8]. The Debtor is a debtor in possession under 11 U.S.C. §§ 1107 and 1108; no trustee or examiner has been appointed and no committee has been formed.

## ARTICLE III — ASSETS AND LIABILITIES

3.1 Assets. The Debtor's scheduled assets total $13,873,000.00, consisting entirely of causes of action against third parties. None of them is the subject of a pending lawsuit as of the petition date. They are: the claim against Canaveral Crossroads, LLC, $4,500,000; the claim on the Boatworks Project (AGPM/BW), $3,600,000; the claims against the Trent Development subsidiaries, $2,400,000 stated net of what the Debtor owes the Trent parties; the claim on the KCB — Kings County Beach Club Project, $1,740,000; the claim on Surfside Point, also referred to as the Goulds Surfside or Monroe Project, $1,320,000; a turnover and accounting claim against Alison Pitkanen, Esq. for $288,000 of funds from the Holly Bluff loan closing that the Debtor's accounting

shows remain on deposit with her; and a claim against the surety on the notary bond of Janelle Moraya, capped at the penal sum of $25,000. The Debtor also holds miscellaneous residual claims that it deems uncollectible and has scheduled at no value, and an equity interest of approximately seven percent (7%) in Cape Crossing Resorts, Inc. of unknown value. The Debtor holds no real property, no cash, no bank accounts, no equipment, and no inventory. Every dollar available to creditors must therefore be collected, and most of it must be collected through litigation that has not yet been commenced. The realizable value depends on the outcome of that litigation.

3.2 Liabilities; no secured claims. The Debtor's records reflect no perfected, unavoidable secured claims and no priority claims. The Factors lien attached to assets that were returned, and the Bill'd judgment is being vacated, with the associated lien expired and unperfected. The Debtor's General Unsecured Claims total $11,204,267.06, including scheduled Claims of PEDIXON, LLC ($2,100,000, Disputed), the Trent — Cherry Village Note ($1,345,726, Disputed), Martin C. Flynn, Jr. ($1,272,763, Disputed, an insider Claim), IMQA Investments, Inc. ($1,156,359), the Trent — Eustis Note ($1,018,701, Disputed), Horton S. Johnson ($917,000), Bill'd ($891,338, Disputed), Joanna G. Bornmiller ($713,136, Disputed), and Cape Crossing Vacation Rentals, LLC ($59,484), among many trade creditors. The Claims of Horton S. Johnson, IMQA Investments, Inc., and Cape Crossing Vacation

Rentals, LLC are scheduled in the amounts alleged in the involuntary petition and admitted in the Debtor's Answer.

**The Bill'd Claim and the usury objection.**

3.3 The Bill'd Claim is scheduled as Disputed, and the Plan Administrator will object to it. The objection will assert that the underlying extension of credit is usurious under *Fla. Stat. §§ 687.02* and *687.03*; that, because the effective rate exceeds the thresholds of *Fla. Stat. § 687.071*, the obligation is not "an enforceable debt in the courts of this state" under *Fla. Stat. § 687.071(7)*; and that Bill'd has forfeited the entire interest charged, contracted for, or reserved, and is liable for double the usurious interest exacted, under *Fla. Stat. § 687.04*. For classification, notice, and voting only, the Bill'd Claim is included in Class 2 with every other general unsecured claim. It will receive no Distribution unless and until it is Allowed by a Final Order, and the Plan Administrator will hold a reserve for it in the meantime. Creditors should understand that the outcome of this objection is uncertain: if the Bill'd Claim is Allowed in full, the pool of Allowed Class 2 Claims grows and every other creditor's percentage recovery falls.

## ARTICLE IV — THE RELATIONSHIP WITH CANAVERAL CROSSROADS

4.1 Canaveral is an obligor to the Debtor, not a co-proponent of this Plan. The Debtor holds claims against Canaveral scheduled at $4,500,000, arising from construction work and intercompany advances. Those claims are assets of

this estate. The Plan Administrator will file, prosecute, settle, and enforce them as a creditor in Canaveral's case, and any Cash Canaveral pays becomes Collections here, divided fifty-fifty like every other dollar collected.

4.2 It is anticipated, under Canaveral's own Chapter 11 plan, that the Canaveral obligation is to be repaid at approximately $15,000 per month for 300 months. Those installments are expected to be the steadiest and most predictable component of the Debtor's Collections. Half of each installment is distributed to Class 2 as part of the Creditor Share; the other half, through the Collection Cost Share, supplies the working capital that lets the Plan Administrator prosecute the receivable claims and participate in the tort action against PEDIXON, LLC and ZPD described in Article V. Without that recurring stream, the estate would have to fund its collection litigation entirely out of the contingent and irregular proceeds of the litigation itself.

4.3 Canaveral's Chapter 11 is what makes that recovery possible; a Chapter 7 would not. Canaveral's scheduled assets consist of the Cape Crossing Resort real property, valued at approximately $6,145,000, and no cash. Canaveral's scheduled secured claims total approximately $10,745,352.63 — the Horton Johnson First Note (approximately $3,608,845, secured by the construction-loan mortgage), the Horton Johnson Second Note (approximately $2,388,178, asserted as secured by an August 2026 judgment lien that is subject to review and potential avoidance), the Jetton mortgage (approximately $1,468,484), and the Carton fixture claim (approximately $310,000) — and its

General Unsecured Claims total approximately $11,897,184.51. On those figures the secured debt alone exceeds the value of Canaveral's property. If Canaveral were liquidated under Chapter 7, the resort would be sold at a forced sale, the proceeds would be consumed by the secured claims and the trustee's commission, and the Debtor — whose claims against Canaveral rank as general unsecured claims there — would likely recover nothing. The reorganized repayment under Canaveral's Chapter 11 plan is therefore the difference between a $4,500,000 asset and a worthless one.

4.4 The recovery nevertheless remains contingent. It depends on the confirmation and performance of Canaveral's plan, on the sale or refinancing value of the Cape Crossing Resort, on the avoidance of the asserted Johnson Second-Note lien, and on the outcome of Canaveral's case generally. Creditors should not assume that Canaveral will pay in full or on schedule.

4.5 What separate administration means. The two cases are pending in the same district but are not jointly administered, and the estates are not substantively consolidated. Canaveral's assets are not property of this estate; Canaveral's creditors are not classified or paid under this Plan; and confirmation of this Plan neither binds Canaveral's estate nor depends on confirmation of any plan in Canaveral's case. Canaveral will propose its own plan, and its creditors will vote on that plan separately.

## ARTICLE V — SUMMARY OF THE PLAN

5.1 The Plan has three Classes and no secured Class: Class 1 (Other Priority Claims, unimpaired — the Debtor believes none exist), Class 2 (General Unsecured Claims, impaired — a single, undivided Class paid Pro Rata from the Creditor Share), and Class 3 (Equity Interests, cancelled). Administrative Claims, Priority Tax Claims, and United States Trustee fees are unclassified and paid in full.

**How creditors get paid: the 50/50 division of collections.**

5.2 Every dollar the estate receives after the Effective Date — from collection, settlement, or sale of a receivable, from a judgment or settlement on a Cause of Action, or from Canaveral — is divided in half on receipt. Fifty percent (50%) is the Creditor Share and is distributed to the holders of Allowed Class 2 Claims, Pro Rata, until each is paid in full. Fifty percent (50%) is the Collection Cost Share, which pays the Plan Administrator's compensation and expenses, the contingency fees and costs of collection counsel and experts, litigation costs and funding, and the administrative, priority, and statutory obligations of the estate.

5.3 Two protections accompany that division. If the Collection Cost Share is not enough to pay the Allowed administrative, priority, and statutory claims in full, the shortfall comes out of the Creditor Share before any further Distribution, as *11 U.S.C. § 1129(a)(9)* requires. And any amount left in the Collection Cost Share once all collection and administrative costs are paid is added to the Creditor Share and distributed to Class 2 at the final Distribution. The

Plan Administrator will account separately for each share and report Collections and disbursements in the post-confirmation reports.

5.3-1 What the professionals are paid. Special litigation counsel, once retained and approved, is to be paid a contingency fee of thirty-three and one-third percent (33⅓%) of gross recoveries as a cost of suit, taken off the top before Collections are divided. The Plan Administrator is to be paid five percent (5%) of gross recoveries, charged to the Collection Cost Share and not to the Creditor Share. No fee is payable to a trustee, and none is sought; there is no trustee in this case. On a $1,000,000 recovery the arithmetic is: $333,333 to litigation counsel; $333,333 to the Creditor Share for distribution to Class 2; and $333,334 to the Collection Cost Share, from which the Plan Administrator's $50,000 is paid, leaving $283,334 for administrative and priority claims, United States Trustee fees, and the ongoing cost of collection. Every fee remains subject to 11 U.S.C. §§ 327, 328, 330, 331, and 363 and to allowance by the court.

**What the Plan Administrator will be doing.**

5.4 The Plan Administrator's principal task is prosecuting lawsuits to collect the money owed to the Debtor. Three customer claims have been identified and quantified, several more are expected to be identified, and the estate also holds several discrete recovery claims:

(a) Trent Development subsidiaries — apartment rehabilitation projects. Claims against the Trent Development subsidiaries, including Cherry Village, L.P. and Austin Commons, L.P., and the pending Tennessee action

Sherwood Construction, Inc. v. Cherry Village, L.P., No. 25-1562-I (Tenn. Ch. Ct. Davidson Cnty.). The Debtor scheduled this claim at $2,400,000, stated net of the amounts the Debtor owes the Trent parties. The Trent Claims scheduled against the Debtor on Schedule E/F total $2,364,427.12. Whether that amount is extinguished by offset — which would reduce the pool of Allowed Class 2 Claims by the same amount and raise every remaining creditor's percentage recovery — or is instead already reflected in the net figure scheduled as an asset, is addressed in Article VI. The Debtor presents both outcomes.

(b) The Boatworks Project (AGPM/BW). A claim for unpaid contract balances and for charges billed above the contract's maximum price, scheduled at $3,600,000.

(c) KCB — the Kings County Beach Club Project. A claim for unpaid contract balances and for charges billed above the contract's maximum price, scheduled at $1,740,000.

(d) Surfside Point — the Goulds Surfside or Monroe Project. A claim for unpaid contract balances and retainage, scheduled at $1,320,000. A claim of lien was recorded on January 8, 2026 and the owner recorded a notice of contest of lien. The Debtor prosecutes this claim as an unsecured contract claim and does not rely on the lien.

(e) Canaveral Crossroads. $4,500,000, anticipated to be repaid at approximately $15,000 per month for 300 months under Canaveral's plan, as Article IV describes.

(f) The Janelle Moraya notary bond claim. A claim against the surety on the bond of Janelle Moraya, the notary who improperly notarized documents. Recovery is capped by the penal sum of the bond at $25,000, which is the amount scheduled.

(g) The Pitkanen escrow claim — the Holly Bluff closing. Alison Pitkanen, Esq. shorted the lender funding at the Holly Bluff loan closing, and the Debtor's accounting shows $288,000 remaining on deposit with her on the Debtor's accounts. The Plan Administrator will bring an action to compel an accounting and the turnover or disbursement of those funds to the Debtor. The Debtor anticipates that she may respond that the funds are no longer on hand, and so treats the claim as disputed. Because the funds were required to be held in an attorney trust account, the Debtor does not expect the dispute to be protracted. If the funds cannot be recovered from the trust account itself, the Debtor will look to her professional liability insurance, to her personal assets, and to the Florida Bar Clients' Security Fund, whose award limits may cap any recovery from that source. Creditors should note that Schedule E/F also lists a Disputed Claim of Pitkanen / Lagenhoff against the Debtor for $277,494; setoff and recoupment are likely to be raised, and a net recovery materially smaller than $288,000 is possible. This claim is unrelated to the Trent Development claim.

(h) The PEDIXON and ZPD tort action. The Debtor will join, as a plaintiff, in the tort action against PEDIXON, LLC and ZPD. The Debtor asserts that the action has a face value of approximately $100,000,000. A realistic

collection is estimated in the range of $20,000,000 to $25,000,000, of which the Debtor's estate would be entitled to approximately ten to twenty percent (10%–20%), or approximately $2,000,000 to $5,000,000. This is the single largest and the single most speculative item in the analysis.

(i) Additional claims. The Debtor also holds miscellaneous residual claims that it has scheduled at no value because it deems them uncollectible, and further claims against customers and other obligors are expected to be identified as the Plan Administrator completes the review of the Debtor's books and projects. No value is assigned to them here.

The amounts stated are estimates only. They are not admissions, they do not limit any recovery, and they are not representations that any amount will in fact be collected.

**Timing of payments; no fixed term.**

5.5 The Plan Administrator will make an interim Distribution within thirty (30) days after the end of each calendar quarter in which more than $50,000 is available, net of reserves, and at least once in every four consecutive quarters if any amount is available. A final Distribution follows when the assets have been reduced to Cash and the Disputed Claims resolved. The Plan sets no outside date. Creditors should expect payment in installments over a period of years, not in a single lump sum: the Canaveral obligation is payable in monthly installments over an extended term, and the collection litigation will take time to resolve. The

Plan Administrator will file post-confirmation reports and pay quarterly fees under *28 U.S.C. § 1930(a)(6)* until the case is closed.

## ARTICLE VI — LIQUIDATION ANALYSIS AND BEST-INTERESTS TEST

6.1 Under *11 U.S.C. § 1129(a)(7)*, each holder of an impaired Claim who does not accept the Plan must receive at least as much as it would in a Chapter 7 liquidation. Because the Plan is itself a liquidation conducted by the same Plan Administrator, but avoids the additional layer of a Chapter 7 trustee's statutory commission under *11 U.S.C. § 326* and duplicative expense, and preserves orderly collection value, the Debtor submits that the Plan satisfies the best-interests test for every Class.

6.2 The Debtor's recovery is a function of collections, not of book value. The Debtor holds no real property and no cash. A Chapter 7 trustee would inherit the same portfolio of claims, would have to prosecute the same lawsuits, would charge a commission on every dollar collected on top of the same collection costs, and would lack the Plan Administrator's familiarity with the underlying projects. Two items would fare materially worse in Chapter 7. The Canaveral obligation would be worth little or nothing if Canaveral were itself liquidated under Chapter 7, as Article IV explains. And the estate's participation in the PEDIXON and ZPD tort action requires sustained funding that a Chapter 7 estate with no cash could not supply.

6.3 Estimated sources of recovery. The table below sets out the Debtor's present estimates. The first five lines are the causes of action scheduled on Schedule A/B at the values the Debtor has assigned them. The PEDIXON and ZPD action is scheduled at no value but is carried here at the Debtor's estimate of what it may produce. The low and high columns differ only in the assumed recovery on the PEDIXON and ZPD action; every other line is stated at a single estimate. No discount for the cost, delay, or risk of collection has been applied to any line — each figure assumes the claim is collected in the amount stated. Creditors should read the table with that assumption in mind.

| **Source of recovery** | **Low** | **High** |
|---|---:|---:|
| Canaveral Crossroads — anticipated at approx. $15,000 per month for 300 months under Canaveral's plan | $4,500,000 | $4,500,000 |
| Boatworks Project (AGPM/BW) — contract balances and charges above the contract maximum | $3,600,000 | $3,600,000 |
| Trent Development subsidiaries — apartment rehabilitation projects, scheduled net of offset | $2,400,000 | $2,400,000 |
| KCB — Kings County Beach Club — contract balances and charges above the contract maximum | $1,740,000 | $1,740,000 |
| Surfside Point — Goulds Surfside / Monroe Project — contract balances and retainage | $1,320,000 | $1,320,000 |
| Pitkanen escrow — Holly Bluff closing; turnover and accounting claim, subject to asserted setoff | $288,000 | $288,000 |
| Janelle Moraya notary bond — capped at the penal sum of the bond | $25,000 | $25,000 |
| PEDIXON, LLC and ZPD tort action — 10%–20% of an assumed $20,000,000–$25,000,000 collection (scheduled at no value) | $2,000,000 | $5,000,000 |
| **Miscellaneous claims deemed uncollectible; additional claims not yet identified** | **not estimated** | **not estimated** |
| **Estimated gross Collections (no collection discount applied)** | **$15,873,000** | **$18,873,000** |

| | | |
|---|---|---|
| **Creditor Share — 50% of Collections** | **$7,936,500** | **$9,436,500** |

6.4 Estimated Class 2 claims and recovery. The Debtor presents two cases. In the base case, the pool of Allowed Class 2 Claims remains the full scheduled $11,204,267.06. In the offset case, the Trent recovery extinguishes by offset the $2,364,427.12 of Trent Claims scheduled against the Debtor, which produces no Cash but reduces the pool by that amount and raises every other creditor's percentage recovery. The base case is presented first because the $2,400,000 scheduled as the Trent asset is stated NET of what the Debtor owes the Trent parties; if that net figure already reflects the offset, the offset cannot also be applied to reduce the claim pool without counting the same $2,364,427.12 twice.

| **Allowed Class 2 Claims** | **Amount** |
|---|---|
| Scheduled General Unsecured Claims (Schedule E/F) | $11,204,267.06 |
| Base case — estimated Allowed Class 2 Claims, no Trent offset | $11,204,267.06 |
| **Base case — estimated Class 2 recovery (Creditor Share ÷ estimated Allowed Claims)** | **approx. 71% to 84%** |
| **Offset case — less Trent obligations extinguished by offset** | **($2,364,427.12)** |
| **Offset case — estimated Allowed Class 2 Claims** | **$8,839,839.94** |
| **Offset case — estimated Class 2 recovery** | **approx. 90% to 100%** |

6.5 The estimate is sensitive to several assumptions. The spread between the two cases in the table — approximately 71% to 84% against approximately 90% to 100% — turns entirely on the treatment of the Trent offset described in section 6.4, which the Debtor will resolve before this Disclosure Statement is approved. If the Bill'd Claim is Allowed rather than disallowed on the usury

grounds described in section 3.3, the pool grows by approximately $891,338 and the percentage falls further. Because no collection discount has been applied, any material shortfall in collections on the five scheduled causes of action reduces the recovery dollar for dollar. Conversely, a recovery on the escrow claim from the attorney's insurance or personal assets rather than from the Clients' Security Fund, or the identification of additional customer claims, would improve the result. The Debtor will supplement this analysis with a detailed liquidation exhibit before approval of this Disclosure Statement.

## ARTICLE VII — RISK FACTORS

7.1 Creditors should consider, among other risks: (a) litigation and collection risk — the Debtor's recovery depends almost entirely on winning or settling lawsuits, and the Plan Administrator may lose, may collect less than the amounts claimed, or may obtain judgments that prove uncollectible; (b) the concentration of the estimate in the PEDIXON and ZPD action, which alone accounts for between $2,000,000 and $5,000,000 of the estimated Collections and which may yield nothing; (c) Canaveral risk — the $4,500,000 obligation depends on the confirmation and performance of Canaveral's own plan and on the value of the Cape Crossing Resort, and Canaveral's secured debt exceeds the scheduled value of its property; (d) the 50/50 division of Collections, which means creditors receive half of gross collections while the collection effort is ongoing, subject to the sweep of any surplus at the final Distribution; (e) duration risk — the Plan sets no outside date, the Canaveral obligation is payable monthly

over an extended term, and creditors may wait years for full payment while quarterly fees and administrative costs continue to accrue; (f) the outcome of the objection to the Bill'd Claim, which, if unsuccessful, enlarges the Class 2 pool and reduces every other creditor's percentage recovery; (g) the risk that the Trent offset of approximately $2,364,427.12 does not materialize or is already embedded in the net value scheduled for the Trent asset, which would hold the estimated recovery at approximately 71%–84% rather than approximately 90%–100%; (g-1) the absence of any collection discount in the Article VI table, which assumes each scheduled cause of action is collected in full in the amount the Debtor has assigned it, when none of those causes of action is yet the subject of a filed lawsuit; (h) the risk that the escrowed funds held by Alison Pitkanen, Esq. from the Holly Bluff closing are no longer on hand, in which case recovery on the $288,000 claim depends on her professional liability insurance, her personal assets, or the Florida Bar Clients' Security Fund, whose award limits may cap it, and the further risk that her own scheduled Claim of $277,494 is asserted as a setoff or recoupment against it; (i) the outcome of the other Disputed Claims and Causes of Action, including the PEDIXON and Trent Development Claims; (j) the presence of significant insider Claims; (j-1) the cost of the professionals — a contingency fee of 33⅓% of gross recoveries to special litigation counsel and 5% to the Plan Administrator, which together consume approximately 38⅓% of every dollar collected before administrative costs; (k) the risk that the court does not confirm the Plan or approve this Disclosure Statement; and (l) tax consequences.

Actual recoveries may differ materially from the estimates in this Disclosure Statement.

## ARTICLE VIII — CONFIRMATION AND VOTING

8.1 Who may vote. Only holders of Claims against the Debtor may vote on this Plan. Class 2 is impaired and entitled to vote. Class 1 is unimpaired, deemed to accept, and does not vote; Class 3 is cancelled without Distribution, deemed to reject, and does not vote. Holders of Claims against Canaveral vote in Canaveral's case on Canaveral's plan.

8.2 Acceptance. A Class of Claims accepts the Plan if holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in that Class actually voting accept it. *11 U.S.C. § 1126(c).*

8.3 Confirmation standards. At the confirmation hearing the Debtor must satisfy *11 U.S.C. § 1129(a)*, including the best-interests test and feasibility. If an impaired Class rejects the Plan, the Debtor will request confirmation under the "cramdown" provisions of *11 U.S.C. § 1129(b)*, which permit confirmation over the dissent of an impaired Class if the Plan does not discriminate unfairly and is fair and equitable as to that Class.

## ARTICLE IX — CERTAIN TAX CONSEQUENCES

9.1 The federal, state, and local tax consequences of the Plan are complex and depend on each holder's circumstances. The Debtor has not obtained and does not intend to obtain a ruling or opinion on tax matters. Each

holder should consult its own tax advisor. This Disclosure Statement is not tax advice.

## ARTICLE X — ALTERNATIVES TO THE PLAN

10.1 The alternatives to the Plan are conversion of the case to Chapter 7, dismissal, or a competing plan. The Debtor believes the Plan provides creditors a greater and more certain recovery than reconversion to Chapter 7, which would add a trustee's commission and expense to the same collection litigation, and than dismissal, which would return the parties to piecemeal collection and litigation in which the first creditor to obtain a judgment would take everything.

## ARTICLE XI — RECOMMENDATION

11.1 The Debtor believes the Plan provides the best available recovery to creditors and recommends that all holders entitled to vote accept the Plan.

Respectfully submitted this 15th day of September, 2026.

**FROMANG & SMITH, P.A.**

/s/ Christopher L. Smith
Christopher L. Smith, Esquire
Florida Bar No. 367461
4767 New Broad Street, Orlando, Florida 32814
Telephone: (407) 999-9739 / Email: chris@fromangsmith.com
Counsel for the Debtor in Possession

The undersigned authorized representative of the Debtor approves the filing of the foregoing.

______________________________
Ross Johnston, Chief Restructuring Officer
Authorized Representative of the Debtor

## CERTIFICATE OF SERVICE

I certify that on September 15, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all parties registered to receive electronic notice in this case, including the Office of the United States Trustee.

/s/ Christopher L. Smith
Christopher L. Smith, Esquire
Florida Bar No. 367461
Counsel for the Debtor in Possession