**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

In re:

**SHERWOOD CONSTRUCTION, INC.,**
Debtor.
______________________________/

Case No. 6:26-bk-05428-GER
**Chapter 11**

# DEBTOR'S CHAPTER 11 PLAN OF LIQUIDATION

Sherwood Construction, Inc., as debtor and debtor-in-possession (the "Debtor"), proposes this Chapter 11 Plan of Liquidation (the "Plan") under 11 U.S.C. § 1121(a). The Plan is a liquidating plan for the Debtor alone. It classifies and treats only Claims against, and Interests in, the Debtor. Canaveral Crossroads, LLC is the subject of a separate case pending in this district; the two cases are not jointly administered, the estates are separate and are not substantively consolidated, Canaveral is not a proponent of the Plan, and no Claim against Canaveral is classified or treated here. Canaveral is relevant to the Plan in one respect only: it owes money to the Debtor, and the amounts it pays are a source of the Debtor's Collections. Canaveral will propose its own plan in its own case. The Debtor has no secured creditors, and every unsecured creditor of the Debtor shares Pro Rata in a single Class. Reference is made to the accompanying Disclosure Statement. All holders of Claims entitled to vote are encouraged to read the Plan and the Disclosure Statement in full. Capitalized terms are defined in Article I.

## ARTICLE I — DEFINITIONS, RULES OF CONSTRUCTION

1.1 "Administrative Claim" means a Claim for costs and expenses of administration of the estate allowed under *11 U.S.C. §§ 503(b)* and *507(a)(2)*, including professional fees and quarterly fees payable under *28 U.S.C. § 1930*.

1.2 "Allowed" means, with respect to a Claim, a Claim that is not Disputed and that has been allowed by a Final Order, scheduled as undisputed, or timely filed and not objected to within the time fixed by the Plan or the court.

1.3 "Bankruptcy Code" means title 11 of the United States Code; "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure; and "court" means the United States Bankruptcy Court for the Middle District of Florida, Orlando Division.

1.4 "Bill'd Claim" means the Claim asserted against the Debtor by Bill'd, and by any successor, assignee, or participant, arising from the receivables-advance and financing transaction scheduled on the Debtor's Schedule E/F as Disputed, together with any judgment, lien, or other instrument evidencing that Claim.

1.5 "Canaveral" means Canaveral Crossroads, LLC, the debtor in Case No. 6:26-bk-05426-GER and an affiliate of the Debtor. Canaveral is an obligor to the Debtor and a source of Collections. Canaveral is not a proponent of the Plan, its assets are not property of the Debtor's estate, and no Claim against Canaveral is classified, treated, impaired, or released under the Plan.

1.6 "Causes of Action" means all claims, rights, and causes of action of the Debtor's estate, including avoidance actions under *11 U.S.C. §§ 544, 547, 548, 549,* and *550*, and all commercial, contract, guaranty, and tort claims, whether or not now pending.

1.7 "Collection Cost Share" means fifty percent (50%) of Collections, which the Plan Administrator retains and applies to the costs of collecting, prosecuting, and administering the estate as provided in section 4.4.

1.8 "Collections" means all Cash actually received by the estate on or after the Effective Date, from every source, including the collection, settlement, or sale of accounts receivable and other rights to payment; recoveries on Causes of Action, whether by judgment or settlement; and amounts received from Canaveral on account of the Debtor's claims against it.

1.9 "Creditor Share" means the remaining fifty percent (50%) of Collections, which is the fund from which the Plan Administrator makes Distributions to Class 2, together with any amount added to it under section 4.4(e).

1.10 "Distribution Date" means a date within thirty (30) days after the end of a calendar quarter on which the Plan Administrator makes an interim Distribution under section 5.1, and the date of the final Distribution.

1.11 "Effective Date" means the first Business Day after the conditions in Article VIII are satisfied or waived; "Confirmation Date" means the date the court enters the order confirming the Plan.

1.12 "General Unsecured Claim" means a Claim against the Debtor that is not an Administrative Claim, a Priority Claim, or a Priority Tax Claim.

1.13 "Plan Administrator" means the person appointed under Article IV to administer the Plan, liquidate the assets of the estate, prosecute Causes of Action, and make Distributions; the Debtor proposes Ross Johnston.

1.14 "Pro Rata" means proportionally, so that the ratio of the Distribution on an Allowed Claim to the amount of that Allowed Claim equals the ratio of total Distributions to the total amount of all Allowed Claims in the same Class.

1.15 Rules of construction. The singular includes the plural; "including" is not limiting; and section references are to the Bankruptcy Code unless otherwise stated. In any conflict between the Plan and the Disclosure Statement, the Plan controls.

## ARTICLE II — UNCLASSIFIED CLAIMS

2.1 Administrative Claims. Except to the extent a holder agrees to different treatment, each holder of an Allowed Administrative Claim will be paid in full, in Cash, on the later of the Effective Date or the date the Claim becomes Allowed, from the Collection Cost Share and, if that share is insufficient, from the Creditor Share as section 4.4(d) provides. Applications for professional compensation must be filed within thirty (30) days after the Effective Date.

2.2 Priority Tax Claims. Each holder of an Allowed Priority Tax Claim under *11 U.S.C. § 507(a)(8)* will be paid in full in Cash on the later of the

Effective Date or the date the Claim becomes Allowed, or as otherwise permitted by *11 U.S.C. § 1129(a)(9)(C)*, from the same sources described in section 2.1.

2.3 United States Trustee Fees. All fees due under *28 U.S.C. § 1930(a)(6)* will be paid as they come due until the case is closed, converted, or dismissed.

Administrative Claims, Priority Tax Claims, and statutory fees are not classified, are not impaired, and are not entitled to vote.

## ARTICLE III — CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The Plan classifies only Claims against, and Interests in, the Debtor. A Claim is in a particular Class only to the extent it qualifies and is in a different Class to the extent it qualifies in that other Class.

**The Debtor has no class of secured creditors.** No creditor holds a perfected, unavoidable security interest in any asset of the Debtor. The Plan therefore creates no Class of Secured Claims, and no Claim against the Debtor is treated as secured. Any person asserting a Secured Claim must file a proof of claim, and the Plan Administrator reserves every right to contest the validity, priority, extent, perfection, and avoidability of any asserted lien or security interest. Any Claim that is Allowed only as unsecured is a Class 2 Claim and shares Pro Rata with every other Class 2 Claim.

**Class 1 — Other Priority Claims.** Unimpaired. Paid in full in Cash on the later of the Effective Date or allowance. The Debtor believes there are no Class 1 Claims. Not entitled to vote (deemed to accept).

**Class 2 — General Unsecured Claims. Impaired. Class 2 consists of every Claim against the Debtor other than an Administrative Claim, a Priority Tax Claim, or a Class 1 Claim. All such Claims — trade, contract, litigation, deficiency, insider, and Disputed Claims alike — are placed in a single Class and share Pro Rata. The Plan creates no subclasses and does not separately classify or subordinate any Class 2 Claim. In full satisfaction of each Allowed Class 2 Claim, the Plan Administrator will distribute the Creditor Share — fifty percent (50%) of Collections, as section 4.4 provides — to the holders of Allowed Class 2 Claims, Pro Rata, on each Distribution Date, until each such holder has been paid the Allowed amount of its Claim in full. The Debtor's scheduled General Unsecured Claims total $11,204,267.06, certain of which are Disputed. Entitled to vote.**

**Class 3 — Equity Interests.** Impaired. The equity interests in the Debtor (held by Tiered Capital, Inc.) will be cancelled on the Effective Date, and holders will receive no Distribution unless all Allowed Claims are paid in full with interest. Deemed to reject; not entitled to vote.

**Objection to the Bill'd Claim.** The Bill'd Claim is Disputed, and the Plan Administrator will object to it. The objection will assert that the underlying extension of credit is usurious under *Fla. Stat. §§ 687.02* and *687.03*; that, because the effective rate exceeds the thresholds of *Fla. Stat. § 687.071*, the obligation "shall [not] be an enforceable debt in the courts of this state" under *Fla. Stat. § 687.071(7)*; and that Bill'd has forfeited the entire interest charged,

contracted for, or reserved, and is liable for double the usurious interest exacted, under *Fla. Stat. § 687.04*. The Plan Administrator will also assert every related defense, setoff, recoupment, and counterclaim. Solely for classification, notice, and voting, the Bill'd Claim is included in Class 2; it receives no Distribution unless and until it is Allowed by a Final Order, and the Plan Administrator will reserve for it under section 5.2 pending resolution. Nothing in the Plan allows the Bill'd Claim or waives any objection to it.

The Plan reserves all rights as to the amount, validity, priority, extent, and avoidability of every Claim and asserted lien, including the disputed PEDIXON and Trent Development Claims.

## ARTICLE IV — MEANS OF IMPLEMENTATION

4.1 Liquidation. The Plan will be implemented through the orderly liquidation of the Debtor's assets and the Distribution of the proceeds to holders of Allowed Claims in accordance with Article III.

4.2 Plan Administrator. On the Effective Date, the Plan Administrator (proposed: Ross Johnston, the Debtor's Chief Restructuring Officer) is appointed as the representative of the estate under 11 U.S.C. § 1123(b)(3)(B) and as disbursing agent. The Plan Administrator is authorized, without further court order except where the Plan or the Bankruptcy Code requires, to: (a) prosecute the collection litigation described in section 4.3 and retain contingency-fee counsel, experts, and consultants to do so; (b) collect, settle, or sell the Debtor's accounts receivable and other rights to payment; (c) file, prosecute, and settle the Debtor's

claims against Canaveral in Canaveral's case, and vote those claims; (d) prosecute, compromise, or abandon the Causes of Action; (e) object to Claims, including the Bill'd Claim; (f) establish and administer reserves; and (g) make Distributions.

4.3 The Plan Administrator's principal task is the prosecution of collection litigation. The Debtor holds no real property and no cash; its assets consist almost entirely of claims for money owed to it, and creditor recoveries depend on turning those claims into Cash. The Plan Administrator will prosecute, settle, or otherwise liquidate them, including:

(a) the claims against the Trent Development subsidiaries on the apartment rehabilitation projects, including the obligations of Cherry Village, L.P. and Austin Commons, L.P. and the pending action Sherwood Construction, Inc. v. Cherry Village, L.P., No. 25-1562-I (Tenn. Ch. Ct. Davidson Cnty.), scheduled at $2,400,000 net of the amounts the Debtor owes the Trent parties. The Trent Claims scheduled against the Debtor total $2,364,427.12; to the extent they are extinguished by offset rather than reflected in that net figure, the Allowed Class 2 pool is reduced accordingly;

(b) the claim on the Boatworks Project (AGPM/BW), arising from unpaid contract balances and charges billed above the contract's maximum price, scheduled at $3,600,000;

(c) the claim on the KCB — Kings County Beach Club Project, arising from unpaid contract balances and charges billed above the contract's maximum

price, scheduled at $1,740,000, and the claim on Surfside Point, also referred to as the Goulds Surfside or Monroe Project, scheduled at $1,320,000, on which a claim of lien was recorded on January 6, 2025;

(d) the $4,500,000 owed to the Debtor by Canaveral, which under Canaveral's own Chapter 11 plan is anticipated to be repaid at approximately $15,000 per month for 300 months, and which the Plan Administrator will pursue and enforce as a creditor in Canaveral's case;

(e) the claim against the surety on the notary bond of Janelle Moraya, who improperly notarized documents, scheduled at $25,000, the penal sum of the bond;

(f) the turnover and accounting claim against Alison Pitkanen, Esq. arising from the Holly Bluff loan closing, at which she shorted the lender funding, for the $288,000 that the Debtor's accounting shows remains on deposit with her on the Debtor's accounts. The Plan Administrator will compel an accounting and the turnover or disbursement of those funds. The Debtor anticipates she may assert the funds are no longer on hand and treats the claim as disputed; because the funds were required to be held in an attorney trust account, the Debtor does not expect a protracted dispute. Secondary sources of recovery are her professional liability insurance, her personal assets, and the Florida Bar Clients' Security Fund. The Plan Administrator reserves all rights as to any setoff or recoupment asserted on account of the Pitkanen / Lagenhoff Claim scheduled against the Debtor;

(g) the Debtor's participation, as a plaintiff, in the tort action against PEDIXON, LLC and ZPD, which the Debtor asserts has a face value of approximately $100,000,000; and

(h) the claim on the Surfside Point (Goulds / Monroe) project for unpaid contract balances and retainage, scheduled at $1,320,000; and the balance of the Causes of Action, including avoidance actions and guaranty and contract claims, the miscellaneous residual claims scheduled at no value, and further claims against customers and other obligors that have not yet been identified.

This list is illustrative, not exhaustive, and the amounts stated are estimates only. No preclusion, waiver, or estoppel results from the failure to identify any claim, receivable, or Cause of Action in this section, and no estimate in this section is an admission, a limitation on any recovery, or a representation that any amount will be collected.

4.4 Collections; division; funding of Distributions.

(a) On receipt, the Plan Administrator divides every dollar of Collections in half: fifty percent (50%) constitutes the Creditor Share, and fifty percent (50%) constitutes the Collection Cost Share. The division applies to gross Collections, including amounts received from Canaveral.

(b) The Creditor Share is held for, and distributed to, the holders of Allowed Class 2 Claims, Pro Rata, on each Distribution Date, and is not available for any other purpose except as subsection (d) provides.

(c) The Collection Cost Share funds the costs of collecting and administering the estate, including the Plan Administrator's compensation and expenses, which are fixed at five percent (5%) of gross recoveries and are charged to the Collection Cost Share; the contingency fee of special litigation counsel, which is fixed at thirty-three and one-third percent (33⅓%) of gross recoveries and is charged as a cost of suit off the top of Collections before the division described in subsection (a); the hourly fees and costs of other counsel, experts, and consultants; litigation costs and funding; Allowed Administrative Claims and Priority Tax Claims; and fees under 28 U.S.C. § 1930(a)(6).

(d) If the Collection Cost Share is insufficient to pay in full the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Class 1 Claims, and statutory fees, the shortfall is paid from the Creditor Share before any further Distribution to Class 2, as *11 U.S.C. § 1129(a)(9)* requires.

(e) Any amount remaining in the Collection Cost Share after payment of all costs described in subsection (c), determined as of the final Distribution, is added to the Creditor Share and distributed to Class 2.

(f) The Collection Cost Share is the working capital of the collection effort. The Debtor expects the recurring monthly payments from Canaveral to be the steadiest component of Collections, and the half of those payments allocated to the Collection Cost Share is expected to fund the ongoing prosecution of the receivable claims and the Debtor's participation in the tort action against PEDIXON, LLC and ZPD.

(g) The Plan Administrator will maintain separate accounts, or separate ledgers within a single account, for the Creditor Share and the Collection Cost Share, and will report Collections, the division, and disbursements from each share in the post-confirmation reports filed with the court and served on the United States Trustee.

(h) Professional compensation is subject to the Bankruptcy Code. Nothing in this section authorizes payment of compensation to the Plan Administrator, to special litigation counsel, or to any other professional except as 11 U.S.C. §§ 327, 328, 330, 331, and 363 permit and as the court allows. No fee payable to a trustee is provided for or sought; there is no trustee in this case.

4.5 Canaveral is an income source, not a co-proponent. The Debtor's claims against Canaveral are assets of this estate and will be pursued as claims in Canaveral's case. Amounts Canaveral pays are Collections when received and are divided under section 4.4. The Plan does not classify, treat, impair, release, or enjoin any Claim against Canaveral; does not bind Canaveral's estate or its creditors; does not substantively consolidate the estates; and and is not conditioned on the confirmation of any plan in Canaveral's case. The two cases are not jointly administered.

4.6 Preservation of Causes of Action. Except as expressly released, all Causes of Action are preserved and vest in the estate for prosecution by the Plan Administrator. No preclusion or estoppel results from the failure to list a Cause of Action.

4.7 Vesting. On the Effective Date, the property of the estate vests in the estate for liquidation by the Plan Administrator, subject to the Plan and Confirmation Order.

## ARTICLE V — PROVISIONS GOVERNING DISTRIBUTIONS

5.1 Quarterly Distributions. The Plan Administrator will make an interim Distribution within thirty (30) days after the end of each calendar quarter in which the amount available for Distribution exceeds $50,000, net of the reserves required by section 5.2. If the amount available is $50,000 or less, it carries to the next quarter, except that the Plan Administrator will make a Distribution at least once in every four consecutive quarters if any amount is available. The Plan Administrator will make a final Distribution when the assets of the estate have been reduced to Cash and Disputed Claims resolved. No Distribution will be made on a Disputed Claim until it becomes Allowed.

5.2 Disputed Claims reserve. The Plan Administrator will reserve Cash sufficient to pay each Disputed Claim as if Allowed in the amount asserted or as estimated by the court. The reserve includes the Bill'd Claim pending resolution of the objection described in Article III. Cash reserved for a Disputed Claim that is later disallowed in whole or in part is released and distributed Pro Rata within Class 2 on the next Distribution Date.

5.3 Unclaimed and de minimis Distributions. A Distribution check not negotiated within ninety (90) days is forfeited and redistributed Pro Rata within

the Class. The Plan Administrator need not make any Distribution of less than $25.

5.4 No fixed term. The Plan sets no outside date. The Plan Administrator will continue to collect, prosecute, and distribute until the assets of the estate have been reduced to Cash and the Disputed Claims resolved. The Debtor expects that period to be measured in years rather than months: the amounts owed by Canaveral are payable in monthly installments over an extended term under Canaveral's own plan, and the collection litigation will take time to resolve. The Plan Administrator will make Distributions as Collections accumulate under section 5.1 throughout that period, will file post-confirmation reports, and will pay fees under *28 U.S.C. § 1930(a)(6)* until the case is closed. Any receivable or Cause of Action that the Plan Administrator determines cannot be collected at reasonable cost may be sold, assigned, compromised, or abandoned, and the net proceeds of any such sale or assignment are Collections divided under section 4.4.

## ARTICLE VI — DISPUTED CLAIMS

6.1 Objections. The Plan Administrator may object to Claims, and will object to the Bill'd Claim on the grounds stated in Article III. Unless extended by the court, objections must be filed within one hundred eighty (180) days after the Effective Date.

6.2 No Distribution pending resolution. The holder of a Disputed Claim receives a Distribution only when and to the extent the Claim becomes Allowed.

## ARTICLE VII — EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 Rejection. Each executory contract and unexpired lease not previously assumed or rejected is rejected as of the Effective Date. The Debtor's schedules reflect that no executory contracts or unexpired leases remain. A Claim arising from rejection must be filed within thirty (30) days after the Effective Date or is forever barred.

## ARTICLE VIII — CONFIRMATION; EFFECT OF CONFIRMATION

8.1 Conditions to the Effective Date. The Confirmation Order must be a Final Order, and the Plan Administrator must have accepted appointment. The Debtor may waive a condition in writing.

8.2 No discharge. Because the Plan provides for the liquidation of all or substantially all of the property of the estate, the Debtor will not engage in business after consummation, and the Debtor is a corporation that would be denied a discharge under *11 U.S.C. § 727(a)(1)* in a Chapter 7 case, confirmation of the Plan does not discharge the Debtor. *11 U.S.C. § 1141(d)(3).*

8.3 Exculpation. The Plan Administrator and the estate's professionals are exculpated from liability for acts or omissions in connection with the administration of the estate and the Plan, except for gross negligence or willful misconduct, to the extent permitted by law.

8.4 Injunction. Except as necessary to enforce the Plan, all persons are enjoined from pursuing against property of this estate any Claim released,

satisfied, or discharged under the Plan. Nothing in this section enjoins any action against Canaveral, against Canaveral's estate, or against any non-debtor.

8.5 Retention of jurisdiction. The court retains jurisdiction to the fullest extent permitted, including to resolve Claim objections and Causes of Action, interpret and enforce the Plan, and enter a final decree.

## ARTICLE IX — MISCELLANEOUS

9.1 Modification. The Debtor may modify the Plan under *11 U.S.C. § 1127* before or after Confirmation as permitted.

9.2 Governing law; severability. Except where the Bankruptcy Code applies, Florida law governs. If any provision is unenforceable, the remainder is unaffected.

9.3 Cramdown. If any impaired Class rejects the Plan, the Debtor requests confirmation under *11 U.S.C. § 1129(b)* as to that Class.

9.4 Final decree. After substantial consummation, the Plan Administrator will seek a final decree closing the case.

Respectfully submitted this 15th day of September, 2026.

**FROMANG & SMITH, P.A.**

/s/ Christopher L. Smith
Christopher L. Smith, Esquire
Florida Bar No. 367461
4767 New Broad Street, Orlando, Florida 32814
Telephone: (407) 999-9739 / Email: chris@fromangsmith.com
Counsel for the Debtor in Possession

The undersigned authorized representative of the Debtor approves the filing of the foregoing.

______________________________________

Ross Johnston, Chief Restructuring Officer
Authorized Representative of the Debtor

## CERTIFICATE OF SERVICE

I certify that on September 15, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all parties registered to receive electronic notice in this case, including the Office of the United States Trustee.

/s/ Christopher L. Smith
Christopher L. Smith, Esquire
Florida Bar No. 367461
Counsel for the Debtor in Possession